# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

MEGAN MILO,

    Plaintiff,

v.                                  Civil Case No.: SAG-18-3145

CYBERCORE TECHNOLOGIES,
LLC, *et al.*,

    Defendants.

## MEMORANDUM OPINION

Plaintiff Megan Milo ("Milo") filed an Amended Complaint against Defendants Cybercore Technologies, LLC ("CyberCore") and Northrop Grumman Corporation ("NGC") (collectively, "Defendants"), alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, *et seq.* ("Title VII"). ECF 47. Milo, a transgender woman, alleges that Defendants subjected her to a hostile work environment (Count One), terminated her employment because of her sex, gender identity, and gender expression (Count Two), and harassed and terminated her to retaliate for her internal complaints about discrimination (Count Three).[1]

On September 17, 2019, United States District Judge Richard D. Bennett issued a Memorandum Opinion and Order which, in relevant part, dismissed certain counts of Milo's original Complaint without prejudice. ECF 41. Subsequently, on October 11, 2019, Milo filed her Amended Complaint. ECF 47. CyberCore and NGC each have filed Motions to Dismiss the

---

[1] The captions of each of the three counts list Title VII the sole statutory basis for the claims. ECF 47. This Court presumes that the Amended Complaint's sole reference to Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981(a), refers only to that statute's expansion of the remedies available to a plaintiff in a Title VII action. *See* ECF 47 ¶ 1.

Amended Complaint, ECF 48 ("CyberCore's Motion"), 49 ("NGC's Motion"). This Court has reviewed those Motions, Milo's Oppositions, ECF 52, 53, and Defendants' Replies, ECF 56, 57. No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2018). For the reasons set forth below, Defendants' Motions will be granted in part and denied in part.

I.   **FACTUAL BACKGROUND**[2]

On or about December 2, 2012, upon approval by NGC, CyberCore hired Milo to be a Senior Software Engineer in a facility in Annapolis Junction, Maryland. ECF 47 ¶¶ 29-30, 33(3)[3]. Milo's workplace housed employees of NGC, employees of other subcontractors of NGC, and employees of federal agencies. *Id.* at ¶ 33. Milo was the only CyberCore employee in the office. *Id.* at ¶ 33(3). Her managers were NGC employees.[4] *Id.* at ¶ 33(4).

In February, 2013, Milo received a promotion to Task Lead. *Id.* at ¶ 31. Milo began living full-time as a female shortly thereafter, on or about March 28, 2013. *Id.* at ¶ 32. Prior to Milo's gender transition, managers from Defendants and the federal government held a meeting, where they explained to the employees on Milo's floor that she "would be transitioning to the female sex, that she would use 'she' and 'her' pronouns, and that she should be treated with dignity and

---

[2] The facts are derived from Milo's Amended Complaint, ECF 47, and are accepted as true for purposes of these Motions. *See Wikimedia Found. v. Nat'l Sec. Agency,* 857 F.3d 193, 208 (4th Cir. 2017) (internal citations omitted). All reasonable inferences to be drawn therefrom are drawn in Milo's favor.

[3] The Amended Complaint contains error in the paragraph numbering, leading to the insertion of paragraphs numbered "3" and "4" between paragraphs 33 and 34. Those paragraphs will be designated herein as "33(3)" and "33(4)."

[4] The Amended Complaint contains inconsistent allegations regarding the office's supervisory structure. Although it alleges that "Ms. Milo's managers were employees of Northrup," *Id.* ¶33(4), it later describes actions taken by "Ray Wise, a federal government manager with supervisory power over Ms. Milo," *id.* ¶ 46a, and notes that Wise was "the Office Manager, who worked with the Department of Defense as the government program manager, who had managerial power over" Milo and other office employees. *Id.* ¶ 46g.

2

respect." *Id.* at ¶ 43. Milo contends that, despite the meeting, her co-workers did not treat her appropriately. *Id.* at ¶¶ 44-45. Specifically, she alleges the following acts:

- "When she had first discussed transition with Ray Wise, a federal government manager with supervisory power over Ms. Milo, he asked if she would be wearing dresses when she transitioned to living as a female… He indicated dismay at her affirmative indication of choice of gendered attire, based on his bias against someone whom he considered to be male wearing attire that he considered to be female." *Id.* at ¶¶ 46a-b.

- "Wise and other male managers and co-workers began to misgender Ms. Milo in order to diminish her gender and gender expression." *Id.* at ¶ 46c.

- "This effort to diminish her gender and gender expression was confirmed for her when, at a meeting, she was told by a male co-worker who worked with and at the direction of Northrop that she wore her heels 'too high.'" *Id.* at ¶ 46d.

- In April, 2013, "Ms. Anderson, a CyberCore manager, told [Milo] that her skirt was too short and was 'bothering people.'" When Milo pointed out another female employee with a shorter skirt, Anderson responded, "Well that doesn't matter. She doesn't work for me, you do." *Id.* at ¶ 46e.

- In March, 2013, Theresa Olson, "who worked with and at the direction of Northrop," told Milo that "she hated transgender people" because her ex-husband was transgender. Milo reported this incident to Anderson in or around June, 2013, but Anderson took no action. *Id.* at ¶¶ 46f, 60.

- In June, 2013, Milo and a male co-worker who worked "with and at the direction of Northrop," Rob Nelson, engaged in a loud and contentious disagreement "about a work matter." After the incident, Wise corrected Milo for her loud argument with Nelson, but Nelson was not disciplined. *Id.* at ¶ 46g.

- A manager, Tom Morehead, "who worked with and at the direction of Northrop," witnessed misgendering by Alex Davis, "who worked with and at the direction of Northrop," and Anderson. In September, 2013, Morehead told Milo that "she needed to 'lay low' because he knew that she was being targeted, and that if she were to complain, she would be in worse trouble." *Id.* at ¶ 46h.

- Davis then brought a complaint against Milo "to his HR," complaining that he was "'walking on eggshells' around her because she asked to be called by her proper female name and female pronouns."[5] *Id.* at ¶ 46i.

---

[5] The Amended Complaint does not identify Davis's employer or HR department. This Court infers that the repeated reference to individuals working "with and at the direction of Northrop" indicates employees of NGC's various subcontractors, and further understands that Davis brought his complaint to the HR department of the entity employing him.

- On or about October 15, 2013, Anderson, NGC's Human Resources manager, Jeremy Knapp, and the federal government program manager placed Milo on a 30-day probationary period "based on Mr. Davis'[sic] complaint." *Id.* at ¶ 46j.

- During that meeting, when Milo explained that Davis's conduct had been discriminatory, and asked that the misgendering and other poor treatment stop, Knapp responded, "What you think really doesn't matter." *Id.* at ¶ 46k.

- During the probationary period, Milo was subject to a Performance Improvement Plan ("PIP") issued by CyberCore and NGC, which indicated "interaction with coworkers is causing Megan to perform at a subpar level." The PIP instructed Milo that, during probation, she should refrain from complaining in public forums, should treat all customers and coworkers with respect. The PIP further indicated, "Northrop Grumman management recognizes that there are extenuating circumstances, but Megan must extend the same understanding and latitude to her coworkers that she expects for herself. The team is walking on eggshells in fear of creating a perceived slight or offense. *Id.* at ¶ 46l.

In addition to those specific allegations, the Amended Complaint contains a series of general allegations, defined as allegations which do not identify the speaker, or the approximate date, or the statement made:

- Davis "was intentionally discourteous to Ms. Milo, in refusing to use her correct name, title, and pronouns, and in making derogatory comments about her sex." *Id.* at ¶ 49.

- Milo "had to be concerned every day that she was on the job and every morning when she got dressed whether someone would criticize her dress, despite the fact that other women were wearing the same thing." *Id.* at ¶ 55.

- Anderson "scrutinized Ms. Milo's attire every day." *Id.* at ¶ 57.

- Milo "notified Ms. Anderson on many occasions of the constant harassment she was experiencing on the job from people in the employ of Northrop and others onsite." *Id.* at ¶ 61. Despite CyberCore's representation that it would ensure she had a positive workplace environment, it took no actions to protect her "from hostility based on her gender by other workers and managers in the workspace." *Id.* at ¶ 62-63.

- Milo "was subjected to negative events relating to her gender every day, and noted some of the more memorable events in her diary on over 35 dates during April through December 2013, as well as dates in 2014." *Id.* at ¶ 70. The events included "daily misgendering – being called the wrong name or pronouns, people referring to her gender in a negative way on a daily basis, references to sex stereotypes on a daily basis, and efforts by her to avoid harassment on a daily basis." *Id.* ¶ 68.

4

During the term of her thirty day PIP, Milo ceased her complaints about discriminatory treatment. *Id.* at ¶ 71. After the thirty day period, sometime in late November, 2013, Anderson confirmed that she had spoken to NGC, and that Milo's probation had ended. *Id.* at ¶ 72.

In February, 2014, Milo "spoke to Mr. Davis again about the misgendering." *Id.* at ¶ 73. Shortly thereafter, "upon information and belief," NGC requested Milo's termination. *Id.* at ¶¶ 74-75. On February 28, 2014, Anderson met with Milo and terminated her. *Id.* at ¶ 76. Anderson told Milo that she could "take a layoff" or "be fired because of her 'bad attitude.'" *Id.* at ¶ 77. Anderson recommended the layoff, because termination could affect Milo's future ability to work in the intelligence community. *Id.* at ¶¶ 79-80. Anderson handed Milo a letter from CyberCore indicating that she was being laid off. *Id.* at ¶ 81. No other employees were laid off at the time. *Id.* at ¶ 82. Milo requested to be informed of other CyberCore job openings, but CyberCore told her that they had no openings, and never informed her of further openings. *Id.* at ¶ 95. A person outside of Milo's protected category was hired to replace her. *Id.* at ¶ 100.

## II.    LEGAL STANDARD

Under Rule 12(b)(6), a defendant may test the legal sufficiency of a complaint by way of a motion to dismiss. *See In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short

and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . ."); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). However, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Further, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 135 S. Ct. 346, 346 (2014) (*per curiam*).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440

(4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). However, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

### III. ANALYSIS

Initially, Milo predicates her claims on discrimination on the basis of sex, in violation of Title VII. As Judge Bennett noted in his September, 2019 opinion, ECF 41 at 11, and as the parties acknowledge, the question of whether Title VII prohibits discrimination on the basis of sexual orientation or gender identity is currently pending before the Supreme Court. On October 8, 2019, the Supreme Court heard oral argument in *R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*, 139 S. Ct. 1599 (Apr. 22, 2019) (granting cert as to the question, "Whether Title VII prohibits discrimination against transgender people based on (1) their status as transgender or (2) sex stereotyping under *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989)?"). To date, no party has sought a formal stay of this case pending the Supreme Court's ruling. Accordingly, this Court will proceed as to the remaining elements of Milo's claims, while recognizing that the Supreme Court's ruling might impact the ultimate viability of her case.

### A. Count I – Hostile Work Environment

In Count One, Milo alleges that the Defendants violated Title VII by subjecting her to a hostile work environment, which exists where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (internal quotation marks omitted). To establish a Title VII claim for a hostile work environment, "a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's [sex]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Boyer-Liberto v. Fontainebleau Corp.,* 786 F.3d 264 (4th Cir. 2015) (quoting *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011) (alteration and internal quotation marks omitted)). "If the harasser is a supervisor, then the employer may be either strictly or vicariously liable," depending on whether the harassment culminates in a tangible employment action. *Strothers v. City of Laurel, Maryland,* 895 F.3d 317, 333 (4th Cir. 2018). In contrast, harassment by a co-worker or a third-party, resulting in a hostile work environment, can be imputed to an employer only "if the employer knew or should have known of the harassment and failed 'to take prompt remedial action reasonably calculated to end the harassment.'" *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 422-23 (4th Cir. 2014) (quoting *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1131 (4th Cir.1995)) (internal quotations omitted).

Assuming, without deciding, that both Cybercore and NGC qualify as Milo's employers, Plaintiff has failed to plead facts demonstrating sufficiently severe and pervasive work conditions imputable to each Defendant. The Amended Complaint, like the original Complaint, names only one employee of each Defendant company: Anderson for CyberCore and Knapp for NGC. *See*

ECF 47. Of those individuals, only Anderson is identified as Milo's supervisor.[6] *Id.* at ¶ 46e, 46j. Milo makes only one specific allegation of harassing conduct by Anderson: her comment about Milo's short skirt. ECF 47 at ¶ 46e. Milo's other generic allegations, such as her assertion that Anderson scrutinized her attire every day, ECF 47 at ¶ 57, are not sufficiently specific to form a factual predicate for a claim of hostile work environment. *See Carter v. Ball,* 33 F.3d 450, 461-62 (4th Cir. 1994) (finding testimony that a supervisor generally reprimanded the plaintiff publicly but his co-workers in private was too general to "suffice to establish an actionable claim" of harassment creating a hostile environment); *see also Dangerfield v. Johns Hopkins Bayview Med. Ctr., Inc.,* Civil No. JKB -19-155, 2019 WL 6130947, at *3 (D. Md. Nov. 19, 2019) (stating, with respect to general allegations of consistent "condescending and abusive language and behavior," "[w]ithout details about the nature of the remarks and behavior at issue, it is impossible for the Court to determine whether the behavior she complains of would be seen as objectively hostile by a 'reasonable person'"); *Lenoir v. Roll Coater, Inc.*, 841 F. Supp. 1457, 1462 (N.D. Ind. 1992) (finding plaintiff's allegations of being reprimanded more severely than co-workers, without reference to exact dates, to be insufficient to support a harassment claim), *aff'd*, 13 F.3d 1130 (7th Cir. 1994). Milo does not allege what Anderson's alleged "scrutiny" of her workplace attire entailed, nor does she link the comments to her gender identity or sex.

Essentially, then, Milo alleges a single affirmative act by Anderson, telling Milo that her skirt was too short for the workplace. As Judge Bennett found, that single comment is insufficient to constitute a hostile work environment. *See* ECF 41 at 13 ("Further, with regard to Cybercore

---

[6] Although Milo alleges generally that her supervisors were NGC employees, ECF 47 at ¶ 33(4), she does not name them and does not identify their state of knowledge regarding any harassing behavior. Instead, as noted above, Milo identifies Ray Wise, an employee of the Department of Defense, as the Office Manager. *Id.* at ¶ 46(g). She does not allege that Knapp, the only NGC employee identified in the Amended Complaint, functioned as her supervisor.

specifically, it appears that only one alleged action can be attributed to CyberCore – her supervisor telling her that her skirt was too short. Such a comment is insufficient to support an action under Title VII.").

The remainder of Milo's allegations, which do not involve conduct by NGC or CyberCore supervisors, must be considered under the negligence standard applicable to co-worker or third-party harassment. *Freeman*, 750 F.3d at 422–23. Due to the structure of the office in which Milo performed her work, there is an issue with respect to what conduct, by other companies' employees, might be imputable to NGC or CyberCore. The Amended Complaint identifies three primary harassers: Wise, a federal government employee, Olson, an employee of another subcontractor, and Davis, also an employee of another subcontractor. *E.g.* ECF 47 ¶ 83, 59, 49. Milo vaguely asserts that Davis "worked with and at the direction of" NGC, but does not directly state that he was ever employed by NGC. Because none of those individuals are employed by NGC or CyberCore, Milo has to allege that NGC or CyberCore knew or should have known about the harassment, and failed to address the conduct. *Freeman,* 750 F.3d at 422-23. However, Milo makes very limited allegations to establish that she reported the individuals' specific conduct to NGC or CyberCore. She does allege that she told her supervisor, Anderson, of a single comment made by Olson (regarding her hatred of transgender people as a result of her transgender ex-husband), and that Anderson failed to take remedial action. ECF 47 at ¶¶ 46f, 59-60. That single comment from a non-CyberCore employee, while unquestionably rude, does not meet the "high bar in order to satisfy the severe or pervasive test." *EEOC v. Sunbelt Rentals, Inc.,* 521 F.3d 306, 315 (4th Cir. 2008).

Additionally, Milo makes several conclusory allegations about reporting discriminatory behavior to her employers. For example, Milo alleges that, during the meeting in which she was

placed on a PIP, she reported to both Anderson and to Knapp of NGC "that Mr. Davis's conduct was discriminatory." ECF 47 at ¶ 46k. However, Milo does not specify exactly what factual allegations she described to CyberCore and NGC. See *id.* ("Ms. Milo explained that Mr. Davis's conduct was discriminatory and requested as an accommodation that the misgendering and other poor treatment stop."). Similarly, Milo alleges that she "notified Ms. Anderson on many occasions of the constant harassment she was experiencing." ECF 47 ¶ 61. Without knowing what specific harassment, if any, Milo not only experienced, but also reported, this Court cannot ascertain whether NGC or CyberCore should have taken action to stop it. *See, e.g.*, *Sonnier v. Diamond Healthcare Corp.*, 114 F. Supp. 3d 349, 357 (E.D. Va. 2015) ("Plaintiff has failed to allege sufficient facts to permit the Court to reasonably infer that Thomas's actions were sufficiently severe or pervasive").

The other incidents Milo describes in the Amended Complaint were not, as far as alleged, reported to either NGC or CyberCore. Moreover, some of those incidents are not directly tied to Milo's gender or gender expression. For example, Milo maintains that the incident in which Wise counseled her, and not Nelson, following their loud verbal disagreement, constituted discriminatory treatment. ECF 47 ¶ 46g. However, Milo specifically alleged that the disagreement in that instance was work-related. *Id.* (calling the dispute a "work matter"). Ultimately, for conduct of a third-party subcontractor or government employee to be imputable to NGC or CyberCore, Milo would have to plead that NGC or CyberCore was aware of specific incidents amounting to harassment, but failed to take remedial action. She makes insufficient such allegations in the Amended Complaint.

In addition to the lack of evidence that NGC or CyberCore was informed of specific incidents of discriminatory treatment, the Amended Complaint, as a whole, provides little insight

into the nature or frequency of the misgendering Milo alleges. Her relevant allegations are as follows:

- Wise and other male managers and co-workers "began to misgender Ms. Milo in order to diminish her gender and gender expression." *Id.* at ¶ 46c.

- Tom Morehead "was a witness to the misgendering by" Davis and Anderson. *Id.* at ¶ 46h.

- "Mr. Davis was intentionally discourteous to Ms. Milo, in refusing to use her correct name, title and pronouns, and in making derogatory comments about her sex." *Id.* at 49.

- "Many people did, in fact, begin to consistently use the correct name or pronoun within a matter of weeks. But there were still holdouts, and this continued regularly, several times a week, until the end of her employment almost a year later." *Id.* at ¶ 69.

- "During the month of February 2014, Ms. Milo spoke to Mr. Davis again about the misgendering." *Id.* at ¶ 73.

These allegations are lacking in specific details, which are required for this Court to determine the nature and extent of the harassment. For example, who are the "holdouts" and what is the nature of their conduct? Did Davis engage in new misgendering in February, 2014, or did Milo speak to him again about previous conduct?

Milo repeatedly alleges that she maintained a diary in which she detailed, on at least thirty-five dates, specific incidents of discrimination. ECF 47 at ¶ 70. She even makes reference to "physically threatening" conduct, although she includes no allegations whatsoever indicating any physical contact or threat of physical contact. *Id.* at ¶¶ 109, 111. Despite having had an opportunity to amend her complaint, ECF 47, Milo neglected to include specific factual allegations to bring her hostile environment claim, against either CyberCore or NGC, into the "plausible" category. Without knowing the nature of the facts underlying Milo's claim, an objective factfinder could not determine whether she was subject to a hostile work environment, even when all of her current

allegations are taken as true. Ultimately, Milo has not added any specific allegations, imputable to either NGC or CyberCore, to bolster the allegations that Judge Bennett previously found insufficient to plead a hostile work environment claim . Accordingly, Count I will again be dismissed without prejudice.[7]

### B. Count II – Discriminatory Termination

Count II of the Amended Complaint plausibly alleges that the cited basis for Milo's termination, her "bad attitude," refers to her complaints about the treatment she had received from her coworkers on the basis of her sex, sex stereotyping, gender, and gender expression. In fact, as alleged, the PIP issued by NGC and CyberCore clearly instructed Milo to refrain from complaining to her coworkers about their treatment of her. ECF 42 at ¶ 46. Taking Plaintiff's collective allegations as true, as this Court must at this stage of the litigation, Plaintiff was addressing with her coworkers what she believed to be discrimination on the basis of her gender, gender expression, sex, and sex stereotyping. Her termination happened shortly after she directly addressed a co-worker about his alleged misgendering of her. *Id.* at ¶¶ 73-76. Viewing all alleged facts in the light most favorable to Plaintiff, NGC and Cybercore's decision to terminate her plausibly resulted from her attempts to "stick up for herself" in the face of discriminatory treatment by her coworkers.

In assessing which entity effected the termination, Milo alleges that NGC requested her removal from the worksite. *Id.* at ¶ 75. Again, construing the facts in the light most favorable to

---

[7] Although the dismissal without prejudice affords Milo one additional opportunity to replead her claim, the Court will not continue to allow repleading in perpetuity. If Milo files a new amended complaint, she should include all specific facts she believes might support her assertion of a hostile work environment, and should not assume that she has listed a sufficient number of representative samples. *See U.S. ex rel. Nathan v. Takeda Pharm. North America*, 707 F.3d 451, 461 (4th Cir. 2013) (finding no abuse of discretion in refusing to allow an amended complaint "[i]n view of the multiple opportunities Relator has been afforded to correct his pleading deficiencies").

13

Milo, she has plausibly stated a claim that NGC had exclusive authority to determine which persons could or could not work at the job site, and exhibited a high degree of control over Milo's employment, thus acting as a joint employer in ordering her termination. *See, e.g., Butler v. Drive Automotive Industries of America, Inc.*, 793 F.3d 404, 414 (4th Cir. 2015) (listing factors to be considered in weighing the element of an entity's control over a plaintiff's employment, including "authority to hire and fire the individual"). Milo has plausibly alleged that NGC had the authority to terminate her, and thus, that CyberCore acted under NGC's direction in doing so. *See* ECF 52 at 19.

Further, although as alleged, NGC made the decision to remove Milo from the work site in question, CyberCore formally employed Milo and issued her paychecks. *See Butler*, 793 F.3d at 414 (listing "possession of and responsibility over the individual's employment records" as a relevant factor). In the Amended Complaint, Milo added an allegation that CyberCore informed her that it had no job openings at the time of her termination. *Id.* at ¶ 95. This Court cannot, at this stage of the litigation, consider CyberCore's contention that it terminated Milo because of her failure to apply for other jobs. *See* ECF 48-1 at 2 ("When Plaintiff refused to apply for any of the available positions, it terminated her employment"). However, the added allegation that CyberCore told Milo it had no job openings bolsters her contention that it relied upon her alleged "bad attitude," which, as noted above, could refer to her efforts to resist discriminatory conduct. Again, drawing all reasonable inferences in favor of Milo, CyberCore had alternatives to termination: it could have insisted that NGC provide its employee with a workplace free of misgendering and other perceived harassment, or could have decided to offer Milo a position outside of NGC's workplace in lieu of termination. As the litigation proceeds, CyberCore may be able to establish that such actions were infeasible due to either a lack of available positions or

14

Milo's refusal to apply for them; But under the standard governing a motion to dismiss, Milo's amended claim for discriminatory termination is sufficient.

**Count III - Retaliation**

In Count Three, Milo claims that NGC and CyberCore terminated her employment in retaliation for her protected activity of complaining about the discrimination she had endured. ECF 47 at ¶¶ 144–49. Specifically, she alleges that she "made complaints to Defendants CyberCore and Northrop about her reasonable and good faith belief that she had been subjected to discrimination." *Id.* at ¶ 144. She also alleges that the reason cited for her termination was her "bad attitude." *Id.* at ¶ 77.

Had Milo relied exclusively on the temporal proximity between her complaints and her termination, her claim would be less plausible. Milo's her most recent complaints to NGC and CyberCore occurred at the PIP meeting on or about October 15, 2013, *id.* at ¶ 46j, and her termination happened roughly four months later, following her successful completion of the probationary period. *See King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (lapse of two months and two weeks between protected activity and adverse action is "sufficiently long so as to weaken significantly the inference of causation"); *Pascual v. Lowe's Home Centers, Inc.*, 193 F. App'x. 229, 233 (4th Cir. 2006) (explaining that a delay of three to four months is too long to establish causal connection by temporal proximity). Here, however, Milo does not rely on the time gap alone. *See Pascual*, 193 F. App'x at 233 (stating temporal proximity is not sufficient to prove causation unless the time between the protected activity and the adverse action is "very close"). CyberCore and NGC's citation to her "bad attitude," as the reason for termination, suffices to push her allegations over the line of plausibility. When viewed in the light most favorable to

Milo, the allegations could suggest that she was terminated in retaliation for her continued complaints to management and to her co-workers about discrimination.

## IV. CONCLUSION

For the reasons set forth above, CyberCore's Motion to Dismiss, ECF 48, and NGC's Motion to Dismiss, ECF 49, will each be granted in part as to Count I, and denied in part as to Counts II and III. Count I will be dismissed without prejudice. A separate implementing Order follows.


Dated: January 13, 2020                        /s/
                                               Stephanie A. Gallagher
                                               United States District Judge